MCKAY v. CORWINE ET AL.

[No. 9,486. Filed Mai 12, 1918. Rehearing denied May 28, 1918. Transfer denied January 24, 1919.]

1. APPEAL.—*Sufficiency of Evidence.—Scope of Review.*—In determining the sufficiency of the evidence to sustain the judgment the court on appeal must consider only the evidence most favorable to appellee and the inferences to be drawn therefrom in appellee's favor. p. 240.

2. HUSBAND AND WIFE.—*Wife as Surety.—Determination of Relation.—Statute.*—Whether a married woman is surety within the meaning of §7855 Burns 1914, §5119 R. S. 1881, is not to be deter-

McKay *v.* Corwine—69 Ind. App. 238.

mined by the form of the contract, nor from the basis from which the contract was had, but from whether she is to receive in person, or in benefit to her estate, the consideration upon which the contract rests, and to the extent to which she receives the benefit of a contract she is not a surety, but a principal. p. 246.

3. PRINCIPAL AND AGENT.—*Agent's Embezzlement of Principal's Funds.—Remedies of Principal.*—Where an agent, in violation of his trust, uses the money of his principal, the law implies a trust in favor of the principal, and to enforce it equity will subject the property purchased to the claims of the principal, as against either a volunteer or a fraudulent grantee. p. 246.

4. HUSBAND AND WIFE.—*Joint Obligations.—Wife as Husband's Surety.*—Where a husband acted as agent in handling trust funds, making investments, etc., for a period of years, and he and his wife maintained a joint bank account in which money received in the course of business was commingled with their personal funds, and real estate was purchased in their joint names with funds taken from such account, the wife received a benefit to her estate by a settlement agreement of a client, who forebore to sue for an accounting, or to follow the joint property of the husband and wife, to satisfy her claim, so that the wife was a principal, and not her husband's surety, on a note and mortgage executed by both in full release of all claims against the husband. p. 246.

5. HUSBAND AND WIFE.—*Mortgages.—Wife as Signer.—Relation.— Evidence.*—In an action against a widow to foreclose a mortgage on property which she had held jointly with her husband, the mortgage, which was executed by the husband and wife, having been given in satisfaction of a claim of the mortgagee against the husband, it was not error to refuse to allow defendant to testify whether she received any money, property or thing of value for the execution of the mortgage, where there was sufficient consideration therefor in the mortgagee's forbearance to sue for an accounting, or to follow the joint property of the husband and wife. p. 247.

From Marion Superior Court (95,955) ; *Theophilus J. Moll,* Judge.

Action by Dessie M. Corwine against Martha N. McKay and others. From a judgment for plaintiff, the defendant named appeals. *Affirmed.*

*Elmer E. Stevenson,* for appellant.

*Charles W. Miller* and *Henry M. Dowling,* for appellee.

IBACH, C. J.—This action was brought by appellee, Dessie M. Corwine, against appellant on a note signed by Horace McKay and appellant, payable to plaintiff, and to foreclose a mortgage on certain real estate given to secure it. Certain other junior lienholders were made parties defendant to answer to their interests.

The complaint is in one paragraph, and is in the usual form in such actions. Appellant answered by general denial and three special paragraphs, setting up with slight variations the defense of suretyship. Other pleadings were filed, but what we have indicated is sufficient for an understanding of the questions presented.

The trial court found that appellant was a principal on the note and mortgage, decreed a foreclosure of the mortgage, and rendered personal judgment against her for the deficiency.

The controlling question is whether or not there is evidence to sustain the decision of the trial court that appellant was a principal on the note and mortgage. If her obligation was that of a surety it is admitted in effect that she is not liable.

In considering the sufficiency of the evidence, we must take the evidence most favorable to the appellee and the inferences to be drawn in appellee's 1.    favor. *Southern Product Co.* v. *Franklin Coil Hoop Co.* (1915), 183 Ind. 123, 129, 106 N. E. 872.

The undisputed facts show that for a period of about twenty-five years Horace McKay (appellant's husband), hereinafter referred to as McKay, was the

trusted agent of various persons, including appellee, in handling of trust funds, making investments, collecting the principal and interest in such investments, and similar service. About the year 1907 McKay's health began to fail, and at that time he wanted to close his business with appellee, but at her solicitation continued to act as her agent until in 1909, when his health became such that he sent for appellee to come and they would close their business. Appellee, together with her attorney, came to Indianapolis, and an audit of the books was made. It was found that McKay had approximately $25,000 in property belonging to appellee to surrender, and it was also found that he was indebted to her in a considerable sum, approximating $5,500. In making the final settlement between them, McKay and appellee executed a contract, which was introduced in evidence, and provides, among other things, that "Dessie M. Corwine will take, also the following described real estate, which now stands in her name or will, at the time of this settlement, be conveyed to her," and that McKay and appellant "will execute to Dessie M. Corwine their promissory note * * * for $2,500 * * * secured by a mortgage" on the property in question, and provided also that when the details of said agreement had been carried out it would stand as a release of all claims of whatsoever nature between the parties.

Appellant was present during the negotiations between McKay and appellee, through their attorneys, but she is not shown to have taken any part in the negotiations, except that on the same date the agreement was entered into she joined with her husband in the execution of the note and mortgage sued on. Ap-

pellant knew of the kind of business her husband was doing and that he was investing money of others and making his livelihood out of the commission earned thereby. Appellant had inherited a considerable amount of property from an ancestral estate, which she turned over to her husband to invest, and which he did invest, together with money from his business, in property which was taken in their joint names. At the time of making the agreement and at the time of his death in May, 1914, McKay held no property in his own name. Appellant and her husband kept a joint bank account in which all the rents from real estate and other money, with the exception of very limited personal accounts, were deposited in their joint names and checked out on their joint order.

Thomas D. Stevenson as witness for appellant testified as to certain facts disclosed by the audit of the books, in substance, as follows:' McKay had been managing appellee's property for several years. His books showed that he had received money from her and that he had loaned it out to different people and sometimes collected loans and reloaned the money and in many cases sent money to her in New York. As a result of the audit of the books we found that there was a balance of property belonging to appellee in McKay's hands that should be turned over to her. "It was practically impossible to tell whether it was cash or real estate or mortgages or what it was. This transaction had covered so many years that the best we could get out of it there was a balance due from Mr. McKay to Mrs. Corwine. Q. And you fixed that part of it on a cash basis? A. We determine l a cash figure as an equivalent of that balance, yes sir. Q. Now you spoke about a reduction of some

of this to a cash basis. Have you an independent recollection of about how much it was found that Mr. McKay was indebted to Mrs. Corwine? A. I wouldn't rely on it. I can only fix it in this way. When Mr. McKay surrendered her property, I took it over and my recollection is I took about twenty-four or twenty-five thousand dollars worth of her property and I think that was all of the property turned over at the time of the settlement except the cash. Q. And about how much was there of cash? A. Fifteen hundred dollars it runs in my mind, but I am not sure. Q. Mr. Stevenson you said you took over some mortgages and took over some cash. Just what did you mean by taking them over? A. Well, Mr. McKay had on hand some property which it was finally agreed belonged to Mrs. Corwine and some real estate in Mrs. Corwine's name. It was that property that I took over—the real estate and the mortgage loans which were agreed upon as belonging to her. I said I took over the real estate. I really didn't take that over. I took over practically nothing but mortgage loans although the real estate was carried on my books for a while. Q. Was * * * Mrs. Mc-Kay * * * present * * *? A. My recollection is that she was, at that time. Mr. McKay's office was in the Board of Trade Building and he was in very poor health and Mrs. McKay was in the office almost constantly. Most of our conferences took place in * * * my father's office, but some of them took place in Mr. McKay's office and at this conference I am sure Mrs. McKay was present. Q. Now do you remember any other occasion * * * when Mrs. McKay was present when any matters connected with the agreement of August 25,

1909, was discussed? A. Yes I remember she and Mr. McKay and Mrs. Corwine and Mr. Paul and my father all met there in  *  *  *  my father's office before this contract was signed up one day, I think for the purpose of discussion, although I am not sure  *  *  *  she (Mrs. McKay) was there with the rest.''

Appellant as a witness for appellee testified: "Q. I believe you testified, Mrs. McKay, that your husband had been engaged in the real estate business in this city for some years. That is true, is it not? A. That is true. Q. About how long was he engaged in that business? A. I think for forty years, but I cannot be accurate. Q. He was engaged in handling other people's money, was he not, Mrs. Corwine's and other people's? A. Altogether. Q. Did he handle any of his own? A. I never remember of him handling a dollar of his own. Q. And he dealt in real estate and mortgages and collected for his clients, did he not? A. Yes.  *  *  *  Q. You knew he was acting as agent for Mrs. Corwine during the latter years of his life, I presume? A. I don't know how to answer that question. Q. Did you know it or not? A. Not until after 1909. After 1909 I did. He was stricken and I had to do all I could to help him at the office.  *  *  *  Q. State whether or not you and your husband had a joint bank account. A. We had for a time. Yes, we had. Q. During what time? A. All the time. Q. From August, 1909, until the time of his death? A. Before that. Q. And when these moneys were collected from rents you deposited it to that joint bank account? A. We did.  *  *  *  Q. And when checks were drawn—— A. We drew as Horace and Martha N. McKay. Q. Was that true from August, 1909, down until the day of his death? A. It was and before

that. Q. You had practically always since you had been having real estate transactions kept a joint bank account? Yes, of course we had. Q. Now, had you ever taken any conveyances or property in your joint names prior to August 25, 1909? A. I don't know. I can't answer that question unless you allow me to refer to the books and records. Q. What is your best recollection? Did you deal in property jointly prior to this Corwine agreement? A. We held property jointly since '70 and before. Q. About when did Mr. McKay put practically all of his property in your joint names? A. I can't name the year, but as we grew older we thought it best to do that. Q. And when was it he put most of his property in your joint names? A. I can't tell. Q. Was it prior to 1909? A. Of course it was. Q. You knew it was taken in your joint names when it was taken? A. I didn't know much about my husband's business. Q. Did you know when he conveyed this property jointly to both of you? A. Yes. Q. Where did that money come from that purchased that property that was conveyed to both of you prior to August, 1909? A. It came largely from my husband's business and from the sale of our joint real estate when we could sell it. We had great difficulty in disposing of our real estate. Q. Did you know anything about this agreement of August 25, 1909, before it was actually drawn up and reduced to writing? A. Nothing whatever. Q. Did you know Mrs. Corwine was here? A. I certainly did. * * * Q. So you knew that she came to make some final settlement with him; did you not? A. I did. * * * Q. Now at the time this agreement was made, Mrs. McKay, did Mr. McKay have any property in his own name? A. No, not at all."

Section 7855 Burns 1914, §5119 R. S. 1881, provides: "A married woman shall not enter into any contract of suretyship, whether as indorser, guarantor, or in any other manner; and such contract as to her, shall be void."

It has been held under such statute that the question as to whether a married woman is surety is not to be determined by the form of the contract, 2. nor from the basis from which the contract was had, but from the inquiry, Was the wife to receive in person, or in benefit to her estate, the consideration upon which the contract rests? To the extent to which she receives the benefit she is not a surety, but a principal. *McCoy* v. *Barns* (1894), 136 Ind. 378, 381, 36 N. E. 134, and cases cited; *Field* v. *Campbell* (1905), 164 Ind. 389, 393, 72 N. E. 260, 108 Am. St. 301, and cases cited; *Way* v. *Peck* (1879), 47 Conn. 23.

It is also well recognized that where an agent, in violation of his trust, uses the money of his principal, the law implies a trust in favor of the principal, 3. cipal, and to enforce the trust thus implied equity will subject the property purchased to the claims of the principal, as against either a volunteer or fraudulent grantee. *Riehl* v. *Evansville Foundry Assn.* (1885), 104 Ind. 70, 72, 3 N. E. 633.

Applying these principles to the facts of this case, appellant did receive a benefit to her estate by the settlement agreement, in consideration of 4. which appellee released all claims against McKay, and consequently surrendered her right to follow the joint property as she might have done. Appellant was in contemplation of law the owner of such property, and therefore such settlement enured

to her benefit. *McCoy* v. *Barns, supra; Corinth* v. *Emery* (1891), 63 Vt. 505, 22 Atl. 618, 25 Am. St. 780.

The decision of the court that appellant was a joint principal is not without warrant from the evidence.

Complaint is made of the exclusion of certain evidence offered by appellant tending to show that she did not receive any consideration for the execution of the Corwine notes and mortgage; and that neither she nor the property in which she was interested was benefited by such notes and mortgage. Testimony of the character indicated was sought to be elicited from appellant while a witness by interrogating her as to whether or not she received any money, property or thing of value for the execution of the notes and mortgage. Conceding that the question was proper, under the theory adopted by the trial court it was not necessary in view of the peculiar circumstances of the case and the way in which the McKays held and dealt with their properties for appellant to have received either money or property on account of these notes in order to be a principal. A sufficient consideration would be, and was, the forbearance by appellee of a suit for an accounting to which appellant would have been a necessary party defendant.

Objection is also made to the exclusion of certain evidence to explain the contract of settlement, as to the effect to be given the transfer of a certain mortgage. It appears from appellee's brief, and is not disputed by appellant, that the court did not attach any weight to such mortgage as a separate consideration for appellant's promise.

Other errors are complained of, but they are not such as to affect any substantial right of appellant.

Judgment affirmed.